## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BOBBY JOE GILLESPIE,

     Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

No. 14 C 4291

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Bobby Joe Gillespie filed this action seeking reversal of the final deci-sion of the Commissioner of Social Security denying his application for Supple-mental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A

---

[1] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI DIB is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff protectively applied for SSI on August 12, 2011, alleging that he became disabled on July 17, 2009, because of stroke, memory loss, inability to concentrate, numbness, high blood pressure, headaches, and depression. (R. at 11, 154, 158). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 11, 78–84, 88–92). On December 10, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 11, 29–77). The ALJ also heard testimony from Mark I. Oberlander, Ph.D., a medical expert (ME), and Edward F. Pagella, a vocational expert (VE). (*Id.* at 11, 56–77, 111–13).

The ALJ denied Plaintiff's request for benefits on December 21, 2012. (R. at 11–24). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since August 12, 2011, the application date. (*Id.* at 13). At step two, the ALJ found that Plaintiff's status post three strokes, hypertension, and affective disorder are severe impairments. (*Id.* at 13–14). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 14–17).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that he can perform sedentary work:

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

In other words, [Plaintiff] can stand or walk for around 2 hours and sit for around 6 hours in an 8-hour day. He also can only lift up to 10 lbs. occasionally, less than 10 pounds frequently. He is limited to [*sic*] in all posturals to occasional performance. [Plaintiff] also requires a cane while walking, but can stand without using a cane. Due to a moderate limitation in concentration, persistence or pace, [Plaintiff] can only perform unskilled work of 1–3 step tasks. He should work in a routine and predictable environment. He can only interact with the public on a limited basis (i.e., giving directions to the washroom). He cannot perform joint tasks but can work in proximity to other employees.

(R. at 18). At step four, the ALJ determined that Plaintiff has no past relevant work. (*Id.* at 22). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including hand sorter, assembler, and bench packager. (Id. at 23). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (Id. at 23–24).

The Appeals Council denied Plaintiff's request for review on April 21, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

On September 14, 2011, Plaintiff submitted an Adult Function Report. (R. at 180–87). He complained of memory loss, numbness, and difficulty standing. (*Id.* at 180, 185). He forgets to take his medication and has to be reminded to complete household chores. (*Id.* at 181–82). He is able to go outside and shop by himself. (*Id.* at 183). He has trouble concentrating and managing his own money. (*Id.* at 183–84). His social activities are limited to family functions. (*Id.* at 184). He avoids social activities because it's hard for him to focus on conversations. (*Id.* at 185). He has trouble finishing what he starts because of trouble paying attention. (*Id.*). He can follow spoken instructions but has trouble understanding written ones. (*Id.*).

On September 25, 2011, Plaintiff presented to Rush University Medical Center, complaining of dizziness. (R. at 344). He had apparently lost consciousness and drove off the road while trying to take his wife to work. (*Id.* at 229, 344). On examination, he exhibited signs of anxiety and depression. (*Id.* at 346, 350). He was diagnosed with an acute ischemic stroke. (*Id.* at 345).

On October 12, 2011, Christine C. Kieffer, Ph.D., a clinical psychologist, performed a consultative examination on behalf of the Commissioner. (R. at 306–08). Plaintiff reported suffering a stroke in 2009 and another one a few weeks prior to the examination. (*Id.* at 306). He complained of body numbness and poor memory. (*Id.* at 306–07). He reported depressive symptoms, including chronic sadness, low

mood, crying spells, social withdrawal, insomnia, and poor appetite. (*Id.* at 307). He also reported symptoms of panic disorder with agoraphobia: he is housebound and must be driven to appointments; he feels very vulnerable on the streets. (*Id.*). On examination, Dr. Kieffer found Plaintiff was fully oriented to person, place and time; his capacity for attention was within normal limits; his capacity for concentration was markedly impaired; his fund of general knowledge was good; his capacity for arithmetic calculation was somewhat impaired; and his capacity for abstract conceptual reasoning and social judgment were within normal limits. (*Id.*). Dr. Kieffer diagnosed major depressive disorder, single episode, and panic disorder with agoraphobia, and assigned a Global Assessment of Functioning (GAF) score of 55.[3] (*Id.* at 308).

On the same day, Liana G. Palacci, D.O., performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 309–12). Plaintiff complained of depressive symptoms, including occasional crying spells, subsequent to his first stroke in 2009. (*Id.* at 310). On examination, Plaintiff's affect, orientation, and recall were normal. (*Id.* at 311). Dr. Palacci diagnosed history of stroke, history of depression, and poorly controlled hypertension. (*Id.* at 312).

On October 27, 2011, Ronald Havens, Ph.D., a nonexamining DDS consultant, completed a Psychiatric Review Technique form. (R. at 317–30). After reviewing the

---

[3] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

record, Dr. Havens opined that Plaintiff has mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (*Id*. at 327). On the same day, Dr. Havens also completed a mental RFC assessment. (*Id*. at 331–33). He concluded that Plaintiff is moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to make simple work-related decisions, to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (*Id*. at 331–32). On March 2, 2012, Michele Womontree, Psy.D., a nonexamining DDS consultant, affirmed Dr. Havens's assessments. (*Id*. at 337).

On January 20, 2012, Plaintiff completed a second Adult Function Report. (R. at 208–15). He complained of severe memory loss, back pain, and numbness. (*Id*. at 208, 211, 212, 213). He has trouble sleeping and forgets to complete household chores and personal hygiene. (*Id*. at 209–10). He is able to go outside daily but has trouble managing his finances. (*Id*. at 211–12). His social activities are limited to visiting his mother. (*Id*. at 212). Plaintiff has trouble paying attention and concentrating, finishing what he starts, and following written instructions. (*Id*. at 213).

On April 22, 2012, Plaintiff was admitted to the St. Bernard Hospital emergency room after complaining of low back pain. (R. at 654). He rated his pain as 10/10 and complained that Vicodin was not helping. (*Id*.). When the doctor denied Plaintiff's

request for an MRI—saying it was not needed—Plaintiff became "very agitated and threw his clothes across the room shouting that he wants an MRI tonight." (*Id.* at 656). The doctor referred Plaintiff to a pain clinic, but he walked out without his discharge instructions. (*Id.* at 654).

On October 23, 2012, Dianne Stevenson, Psy.D., a licensed clinical psychologist, performed a consultative examination at the request of Plaintiff's counsel. (R. at 564–67; *see id.* at 697). She reviewed hospital records and Dr. Kieffer's assessment. (*Id.* at 564). Plaintiff reported suffering two strokes, the first of which occurred in July 2009 and resulted in lost memory, concentration, and word recognition. (*Id.*). He loses feeling in his right leg and cannot sit or walk for long periods. (*Id.*). Dr. Stevenson conducted a number of tests during her two-hour examination. (*Id.* at 565–66). On an intelligence test, Plaintiff's verbal abstract reasoning, fund of learned information, mental arithmetic reasoning, short term memory, problem solving, and ability to learn new concepts were all impaired. (*Id.* at 565). The results of a neuropsychological test indicated that Plaintiff has a visual-motor impairment and an organic impairment—he has difficulty with distortion, rotation, preservation, angulation and integration, which indicates poor planning, lack of insight, and lack of simple comprehension. (*Id.* at 566). Plaintiff reads at the eighth-grade level, and his arithmetic ability is at a fifth-grade level. (*Id.*). On the Beck Depression Index, Plaintiff was in the severe range for depression—he endorsed items of guilt, diffidence, anhedonia, suicidal thoughts, fatigue, irritability, and inattention. (*Id.*). His responses also indicated social alienation, excessive pain, self-recrimination,

and worries about his family. (*Id.*). The results of the Vineland Adaptive Scales test placed Plaintiff at an overall functional level of a 10–11 year old. (*Id.*). "The results suggest that he is unable to make independent life decisions, manage money, or maintain correspondence." (*Id.*). Dr. Stevenson diagnosed depressive disorder—recurrent, mild mental retardation, and a history of stroke, all exacerbated by lack of employment and socialization, and assessed a GAF score of 55. (*Id.* at 566–67). In summary, Dr. Stevenson opined that Plaintiff "maintains a marked disturbance in social functioning."

> As a result, he would be unable to perform work related [ ] tasks that require concentration and attention to details. He would have difficulty maintaining a workplace daily routine, due to his chronic back pain. His prognosis is felt to be poor for any substantial improvement. He is unable to manage his finances without assistance. He is not capable of long term competitive employment. He could function in a supervised workshop setting where his tasks would be repetitive and single-step activities; however, it should be expected that he could be disruptive in any setting. Medication should be maintained for psychological equilibrium.

(*Id.* at 567).

Dr. Stevenson also completed a Psychiatric Review Technique evaluation. (R. at 568–74). She concluded that Plaintiff meets listing 12.04 (Affective Disorders) and listing 12.05 (Mental Retardation). (*Id.* at 568). She opined that Plaintiff has moderate restriction of activities of daily living, marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and has had three episodes of decompensation, each of extended duration. (*Id.* at 573).

In addition, Dr. Stevenson performed a Mental RFC Assessment. (R. at 575–77). She concluded that Plaintiff is markedly limited in his ability to understand and

remember detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and to set realistic goals or make plans independently of others. (*Id.* at 575–76).

At the December 2012 hearing, Dr. Oberlander reviewed the record, observed Plaintiff, and offered testimony as an ME. (R. at 56–69). He found evidence that Plaintiff meets several different Listings: 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addition Disorders). (*Id.* at 57–59). Dr. Oberlander opined that Plaintiff is moderately limited in activities of daily living, markedly limited in appropriate social interactions, and markedly limited in his capacity for concentration, attention, and memory. (*Id.* at 60, 63).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because the ALJ (1) did not properly assess the opinions of Drs. Stevenson, Kieffer and Oberlander, (2) erred in his step three listing

level analysis; and (3) failed to account for his sitting limitations and use of cane in the RFC determination. (Dkt. 17 at 14–25).

## A. ALJ Did Not Properly Evaluate Dr. Stevenson's Opinion

In October 2012, Dr. Stevenson, a licensed clinical psychologist, reviewed the medical records, conducted a two-hour examination of Plaintiff, and performed a battery of tests. (R. at 564–77). On an intelligence test, Plaintiff's verbal abstract reasoning, fund of learned information, mental arithmetic reasoning, short term memory, problem solving, and ability to learn new concepts were all impaired. (*Id.* at 565). The results of a neuropsychological test indicated that Plaintiff has a visual-motor impairment and an organic impairment, which indicates poor planning, lack of insight, and lack of simple comprehension. (*Id.* at 566). Plaintiff reads at the eighth-grade level, and his arithmetic ability is at a fifth-grade level. (*Id.*). On the Beck Depression Index, Plaintiff is in the severe range for depression. (*Id.*). The results of the Vineland Adaptive Scales test placed Plaintiff at an overall functional level of a 10–11 year old. (*Id.*).

Dr. Stevenson diagnosed depressive disorder—recurrent, mild mental retardation and a history of stroke, all exacerbated by lack of employment and socialization. (R. at 566–67). She concluded that Plaintiff meets Listings 12.04 (Affective Disorders) and 12.05 (Mental Retardation). (*Id.* at 568). She opined that Plaintiff has moderate restriction of activities of daily living, marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and has had three episodes of decompensation, each of extended duration. (*Id.* at 573).

By rule, an ALJ "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In evaluating the weight to give an examining physician's opinion, the ALJ must consider relevant medical evidence, the consistency of the opinion with the record as a whole, the physician's specialty, if any, and other factors which support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6). Generally, more weight is given to an examining source than a nonexamining source. *Id*. §§ 404.1527(c)(1), 416.927(c)(1).

In his decision, the ALJ gave "extremely limited weight" to Dr. Stevenson's "purchased opinion":

> I have not found marked limitations in any domain, for reasons discussed above. One would expect far greater treatment or symptoms expressed outside of consultations to support a listing level severity. Indeed [Plaintiff] has not reported anxiety, depression or suicidal ideation apart from the consultative examinations and briefly in the midst of a stroke. [Plaintiff] is not taking any medication for his psychiatric problems. His depression was discussed as "single episode." There have been no mental health emergency department visits or inpatient hospitalizations. There is no objective third party evidence to support the opinion. It is based solely upon [Plaintiff's] statements which are not supported by the rest of the record.

(R. at 21) (citations omitted).

Under the circumstances, the ALJ's decision to give Dr. Stevenson's opinion "extremely limited weight" is legally insufficient and not supported by substantial evidence. First, despite the ALJ's repeated assertions (R. at 16, 17, 20, 21), he cannot give less weight to Dr. Stevenson's opinion merely because it was "purchased." To the contrary, "the fact that relevant evidence has been solicited by the claimant or

her representative is not a sufficient justification to belittle or ignore that evidence." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *see Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ( "[T]he mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report."); *accord Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). How else can Plaintiff carry his burden of establishing his impairments and his RFC other than by asking physicians to weigh in? *See Punzio*, 630 F.3d at 712 ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity. How else can she carry this burden other than by asking her doctor to weigh in?") (citing 20 C.F.R. §§ 404.1512(a), (c), 404.1513(a), (b), 404.1545(a)(3)). "Yet rather than forcing the ALJ to wade through a morass of medical records, why not ask the doctor to lay out in plain language exactly what it is that the claimant's condition prevents her from doing? Indeed the regulations endorse this focused inquiry." *Id*; *see* 20 C.F.R. §§ 404.1513(b)(6) (requesting from claimant "a medical source statement about what you can still do despite your impairment(s)"), 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources.").

Second, the ALJ erroneously rejected Dr. Stevenson's opinion because it was based on Plaintiff's subjective reports. (R. at 21). If an opinion is "based *solely* on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d

363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). But here, Dr. Stevenson performed her own battery of tests. (R. at 564–66). Dr. Stevenson also reviewed hospital records and Dr. Kieffer's assessment. (*Id.* at 564). Moreover, almost all diagnoses—especially mental health evaluations—require some consideration of the claimant's subjective symptoms, and here, Plaintiff's subjective statements were necessarily factored into Dr. Stevenson's analysis. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that Dr. Stevenson disbelieved Plaintiff's descriptions of his symptoms, or that Dr. Stevenson relied more heavily on Plaintiff's descriptions than the test results and her own clinical observations in concluding that Plaintiff was seriously impaired. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *see also Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Third, Dr. Stevenson ran a battery of tests, which supported her conclusions. The WAIS-IV intellectual test indicated that Plaintiff's intellectual abilities are impaired.[4] (R. at 565). The Bender Gestalt test indicated visual-motor impairment, along with poor planning, lack of insight, and lack of simple comprehension.[5] (Id. at 566). The Wide Range Achievement Test found that Plaintiff reads at an eighth-grade level and has a fifth-grade arithmetic ability.[6] (Id.). On the Beck Depression Index, Plaintiff is in the severe range for depression.[7] (Id.). Plaintiff's responses to the Sentence Completion test "indicate social alienation, excessive pain, self-recriminations, and worries about his family."[8] (Id.). Finally, the results of the Vineland Adaptive Scales test places Plaintiff in an overall functional level of ten-years-eight-months.[9] (Id.). Not only are these test results internally consistent, but the

---

[4] "The Wechsler Adult Intelligence Scale (WAIS) is an intelligence test designed to measure cognitive ability in adults and older adolescents, . . . and is the most widely used IQ test, for both adults and older adolescents, in the world." <https://en.wikipedia.org/wiki/Wechsler_Adult_Intelligence_Scale>

[5] The Bender Visual Motor Gestalt Test, or simply the Bender-Gestalt test, is a psychological test used to evaluate "visual-motor maturity," to screen for developmental disorders, or to assess neurological function or brain damage. <https://en.wikipedia.org/wiki/Bender-Gestalt_Test>

[6] The Wide Range Achievement Test is an achievement test which measures an individual's ability to read words, comprehend sentences, spell, and compute solutions to math problems. <https://en.wikipedia.org/wiki/Wide_Range_Achievement_Test>

[7] The Beck Depression Inventory (or Index), is a 21-question multiple-choice self-report inventory, one of the most widely used psychometric tests for measuring the severity of depression. <https://en.wikipedia.org/wiki/Beck_Depression_Inventory>

[8] "Sentence completion tests are a class of semi-structured projective techniques. Sentence completion tests typically provide respondents with beginnings of sentences, referred to as 'stems,' and respondents then complete the sentences in ways that are meaningful to them. The responses are believed to provide indications of attitudes, beliefs, motivations, or other mental states." <https://en.wikipedia.org/wiki/Sentence_completion_tests>

[9] "The Vineland Adaptive Behavior Scales measures the personal and social skills of individuals from birth through adulthood. Because adaptive behavior refers to an individual's

ALJ has not identified any other test results that contradict Dr. Stevenson's conclusions.

The ALJ contends that Plaintiff's IQ score is "inconsistent with [his] level of adaptive functioning."[10] (R. at 17). To the contrary, the record contains many instances demonstrating that Plaintiff has significant difficulties effectively interacting with society. In his Adult Function Reports, Plaintiff asserted that he has memory loss, forgets to take his medicines, has trouble concentrating and paying attention, cannot manage his own money, has trouble understanding written instructions, and neglects his personal hygiene. (R. at 180–87, 208–15). His social activities are limited to family functions, which he tries to avoid because he cannot focus on conversations. (*Id.* at 184–85, 212). While he is able to do some household chores, his oldest son helps take care of his dog and the younger children. (*Id.* at 181, 209). During his interview at the Social Security office, he was not able to concentrate and had difficulty answering questions without going off on a tangent. (*Id.* at 155). He became upset when he could not remember dates or events. (*Id.*). In April 2012, he became "very agitated and threw his clothes across the room shouting that he wants an MRI tonight" after a doctor at the St. Bernard Hospital emergency room told him that the MRI was not medically necessary. (*Id.* at 654–56).

---

typical performance of the day-to-day activities required for personal and social sufficiency, these scales assess what a person actually does, rather than what he or she is able to do." <http://www.come-over.to/FAS/VinelandTest.htm>

[10] Adaptive functioning is "the relative ability of a person to effectively interact with society on all levels and care for one's self." <medical-dictionary.thefreedictionary.com>

Fourth, the ALJ erroneously discounted Dr. Stevenson's opinion because Plaintiff was not seeking psychiatric therapy, not taking any psychiatric medications, and had no mental heath emergency visits or inpatient hospitalizations. (R. at 21). "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment." *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006) (citing cases). The Seventh Circuit and other courts have stressed that "mental illness . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *see White v. Comm'r*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."). Further, there is no requirement that a claimant must receive emergency or inpatient care for a mental illness in order to be disabled. *Tincher v. Colvin*, No. 13 C 8410, 2015 WL 4253632, at *4 (N.D. Ill. July 14, 2015); *see Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 796 (E.D. Wis. 2004) ("[T]here is no requirement in social security law that a claimant require hospitalization in order to demonstrate a severe mental impairment."); *c.f. Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) ("The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves."). Moreover, the Commissioner's own regulations state that the ALJ should not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering . . . information in the

case record, that may explain . . . failure to seek medical treatment." Social Security

Ruling (SSR)[11] 96–7p, at *7. In any event, throughout the record, there is evidence

that Plaintiff suffers from a major depressive disorder. (R. at 346 (exhibiting signs

of depression and anxiety), 350 (same), 308 (diagnosing major depressive disorder),

312 (diagnosing history of depression); *see also id.* at 57–59 (finding by ME that

Plaintiff meets listing for organic mental disorders, affective disorders, anxiety-

related disorders, and personality disorders)). And the ALJ herself found that

Plaintiff's affective disorder is a severe impairment. (*Id.* at 13).

Finally, the ALJ cannot reject Dr. Stevenson's opinion merely because is at odds

with the DDS opinions. (R. at 15, 16, 22); *see Gudgel v. Barnhart*, 345 F.3d 467, 470

(7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for rea-

sons supported by substantial evidence in the record; a contradictory opinion of a

non-examining physician does not, by itself, suffice."). In any event, the DDS doctors

examined the record and prepared their opinions in October 2011 and March 2012

(R. at 317–33, 337), before over 300 pages of medical records were subsequently

submitted, including Dr. Stevenson's examination, testing, and opinion. *See Jelinek*

*v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (criticizing ALJ for relying on stale DDS

opinions over that of the more recent treating physician opinion); *Scott v. Astrue*,

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

647 F.3d 734, 739–40 (7th Cir. 2011) (DDS opinion did not take into account the entire record).

In sum, the ALJ's evaluation of Dr. Stevenson's opinion is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be given Dr. Stevenson's opinion, considering the relevant medical evidence, the consistency of the opinion with the record as a whole, the physician's specialty, if any, and other factors which support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6).

## B. Other Opinion Evidence

The ALJ's decision to reject Dr. Kieffer's diagnosis of agoraphobia is supported by substantial evidence. (R. at 13). While Plaintiff told Dr. Kieffer he was "housebound," his own Adult Function Reports belie that characterization. (*Compare id.* at 307 (reporting to Dr. Kieffer in October 2011 that he is housebound and must be driven to appointments because he feels vulnerable on the streets) *with id.* at 183 (acknowledging in September 2011 that he goes outside and shops by himself), 211 (acknowledging in January 2012 that he goes outside daily)). However, Dr. Kieffer's opinion was based on more than just Plaintiff's agoraphobia complaint. On examination, Dr. Kieffer found that Plaintiff's capacity for concentration was markedly impaired and his capacity for arithmetic calculation was somewhat impaired. (*Id.* at 307). She diagnosed major depressive disorder and assigned a GAF score of 55. (*Id.* at 308). Nevertheless, other than rejecting the agoraphobia diagnosis, the ALJ failed to determine what weight to give the remainder of Dr. Kieffer's opinion. On

remand, the ALJ shall determine the weight to be given Dr. Kieffer's opinion, considering the relevant medical evidence, the consistency of the opinion with the record as a whole, the physician's specialty, if any, and other factors which support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6).

The ALJ gave "extremely limited weight" to Dr. Oberlander's opinion, largely because the ALJ had rejected both Dr. Kieffer's agoraphobia diagnosis and "the paid consultative opinion of Dr. Stevenson." (R. at 21–22). On remand, after properly evaluating Drs. Stevenson's and Kieffer's opinions, the ALJ shall reevaluate the weight to be given Dr. Oberlander's opinion, considering the relevant medical evidence, the consistency of the opinion with the record as a whole, the physician's specialty, if any, and other factors which support or contradict the opinion. *Moss*, 555 F.3d at 561.

## C. Other Issues

Because the Court is remanding to reevaluate the weight to be given to Drs. Stevenson's, Kieffer's, and Oberlander's opinions, the Court chooses not to address Plaintiff's other arguments that the ALJ erred in her step three listing level analysis and failed to account for Plaintiff's sitting limitations and use of cane in her RFC determination. (Dkt. 17 at 14–25). However, on remand, after determining the weight to be given the physicians' opinions, the ALJ shall reevaluate whether his combination of impairments meet or equal a listing. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her

findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [16] is **GRANTED**, and Defendant's Motion for Summary Judgment [21] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: February 26, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge